STATE OF NEBRASKA V. BANKERS UNION OF THE WORLD ET AL.

FILED APRIL 21, 1904. No. 13,595.

1. **Beneficial Associations:** UNLAWFUL ACTS: INJUNCTION. When a fraternal beneficial association refuses and neglects to report to the auditor as required by law, or shall exceed its powers, or conduct its business fraudulently, or fail to comply with any of the provisions of the statute, it is the duty of the auditor to notify the attorney general in writing, and the duty of the attorney general to immediately commence an action against such society to enjoin the same from carrying on any business.

2. **Suspension of Business.** When, in such action, it appears that any of said causes exist, the court must enjoin the defendant from transacting business until such report shall be made, or overt act or violation complained of shall have been corrected, and costs are paid by the defendant.

3. **Reinstatement.** When such report shall be made, or overt act or violation complained of shall have been corrected, and costs are

paid, it is the duty of the auditor to reinstate such defendant, and the society will then be authorized to continue its business.

4. **Government.**  A fraternal beneficial association must have a representative form of government.  This requires that the directors or other officers, who have general charge and control of the property and business of the society and the management of its affairs, shall be chosen by the members.

5. **Diverting Funds.**  Diverting the funds of the society from the purposes for which they are contributed is a violation of the statute and will be enjoined.

6. **Annual Reports.**  All claims for death losses must be included in the annual reports to the auditor.  A failure to make such report as the statute requires is sufficient cause for enjoining the society from transacting business.

7. **Incorrect Records and Reports.**  The books and records of such society must show the true condition of its business and finances, including its benefit assessments and its liabilities, and if they fail to do so, or if the society fails to report to the auditor the details of its business and financial affairs required by the statute, the society will be enjoined from doing business.

8. **Age Limit and Medical Examinations:** MERGER.  Such societies are not allowed to take members who are above the age limit, nor without medical examination, and to do this indirectly by the purchase of the business and risks of another similar society, and consolidating such society with itself, is a violation of law.

9. **Assets:** SOLVENCY.  The assets of such a society do not consist in cash, and tangible securities and property alone.  If its plan of business is feasible and just, it may rely upon the good faith and solvency of its members.  It can not be said to be insolvent when it is reasonably probable that, by its authorized assessments, it can provide sufficient funds to meet its just liabilities.

10. **Pleadings and Evidence:** RECEIVER: INJUNCTION.  Under the pleadings and evidence in this case, it is *held* that it is not a case for the appointment of a receiver and winding up the affairs of the society; but, to secure a correction of abuses and irregularities, the defendant is enjoined, under section 16, chapter 47 of the laws of 1897, from transacting business until the law is complied with in the matters specified.

ORIGINAL action for an injunction to restrain defendant from further proceeding with its business.  *Injunction allowed.*

*Frank N. Prout, Attorney General,* for the state.

*Field & Andrews, contra.*

SEDGWICK, J.

The defendant is a fraternal beneficial association organized under chapter 47, laws of 1897, "An act defining fraternal beneficiary societies, orders or associations, and regulating the same." Under section 16 of the act, it is the duty of the auditor to notify the attorney general, in writing, whenever any such society has refused or neglected to make the report provided for; or, if any such society shall exceed its powers, or conduct its business fraudulently, or fail to comply with any of the provisions of the act, and upon receiving such notice, it is made the duty of the attorney general to "immediately commence an action against such society to enjoin the same from carrying on any business." The attorney general having received such notice from the auditor, began this action in this court against the defendant in pursuance of the statutory requirements.

The Honorable Robert Ryan was appointed referee to take the evidence and report his findings of fact and conclusions of law. A large amount of evidence was taken by the referee, and he has made an exhaustive report, which concludes with the recommendation that this court, by its judgment, permit the defendant to continue in business under certain directions and restrictions. We do not think that this recommendation is within the purview and meaning of the statute. The requirement of the statute is that, if the court shall find that such society was in default, as charged, the defendant shall be enjoined, and shall not have authority to continue in business until such report shall be made, or overt act or violation complained of shall have been corrected, nor until the costs of such action be paid by it.

On the other hand, the attorney general insists that the court appoint a receiver to wind up the affairs of the

defendant and to "distribute the assets as equity would permit." This, the court can not do in these proceedings. There are, no doubt, some allegations in the petition which would be appropriate in an action in the nature of quo warranto to oust a defendant corporation of its franchise and wind up its affairs, and we do not decide that, under proper pleadings and evidence, such a proceeding might not be maintained. But these proceedings, by the express language of the petition, as well as by the character of the allegations, and the nature and force of the evidence brought to sustain them, must be considered to be under section 16 of the act referred to, and the meaning of that section is that, if the allegations are sustained by the evidence, the defendant shall not be allowed to do business until it has complied with the law.

It is the duty of the court to determine and point out the particulars in which the defendant has failed to comply with the law, and to enjoin the defendant from proceeding to carry on its business until these delinquencies in these respects have been corrected. When this shall have been done by the defendant, it will be the duty of the auditor to reinstate the defendant. The court has been greatly assisted by the work of the referee in his exhaustive and painstaking investigation of the evidence and conclusions of fact derived therefrom.

1. By the provisions of section 10 of the act these societies are required, on or before the first day of March of each year, to make and file with the auditor of public accounts a report for the year ending on the 31st day of December immediately preceding. These reports are to be upon "blank forms to be provided by said auditor," and are to be "verified under oath," and are to contain answers to questions specifically prescribed by the statute, among which are: (3) Number of losses or benefit liabilities incurred. (4) Number of losses or benefit liabilities paid. (7) Number and kind of claims for which assessments have been made. (8) Number and kind of claims compromised or resisted, and brief statement of reasons. It

43

appears from the findings of the referee, and is abundantly established by the evidence, that the defendant has failed to make the annual reports contemplated by the statute. It is plainly intended by the statute that the defendant shall report all claims against it on account of death losses. When the insured under one of the defendant's policies has died, and the defendant has notice that a claim is made against it on account thereof, there can be no doubt that such claims should be included in its report to the auditor. When the auditor finds that the defendant has not made the report required by the statute, but refuses so to do, it is his duty to notify the attorney general, who should take proceedings to prevent the defendant from further carrying on business until this error is corrected. The reports of the defendant for several years past were not in compliance with the statute in this respect, and the fact that the auditor has not heretofore enforced the law is not a defense in these proceedings in which he is trying so to do, and the defendant is enjoined from transacting business until such report is made.

2. The referee finds:

"It is provided by section A, division 3 of the constitution of the Bankers Union of the World, that the supreme officers of the supreme lodge shall be 9 in number. These, by section C, division 1 of said constitution, are required to be elected by supreme lodge delegates. It is further provided in said section A, as follows: 'There may also be not more than 8 directors elected by said supreme officers. The officials above designated shall together constitute a board of directors, and all the power and authority of the supreme lodge shall, when not in session, be vested in the board of directors, the same as though the said supreme lodge was regularly convened in open session.' It is provided in section B, division 3 of said constitution: 'All of said officers of the supreme lodge shall be elected for the term of 2 years and until their successors are elected and qualified.' The effect of the above provisions is to create a possible board of directors, 17 in

number, of which board 8 members are to be elected by the executive officers. These 8 directors are not to be chosen by the members of the Bankers Union of the World, nor by the representatives of the said members selected for that purpose."

These findings are abundantly supported by the evidence, and this provision in the organization of this company, is in conflict with section 1 of the act, which provides that "such society shall have a * * * representative form of government." These directors, who control the affairs of the company, must be chosen by the membership thereof, either directly or through representatives chosen by the membership for that purpose. No license to transact business should have been granted to this defendant until such a board of directors was provided for in its organization. The defendant is enjoined from doing business until this error is corrected.

3. It appears from the evidence that the management of the affairs of the society has been exclusively within the control of its supreme executive officers. These officers have not only had charge of the general affairs of the society, but in many instances have dealt with themselves in making contracts in their own personal interest, and, in some instances, in conflict with the interest of the society. In order that the society shall have a representative form of government as required by the statute, the general control of the affairs of the society must be in the hands of directors elected by the membership, as before pointed out. The defendant should not have been licensed to do business while this evil existed, and is therefore enjoined from transacting any further business until this error is corrected.

4. It appears from the findings of the referee, a contract with the president was made by those purporting to act for the defendant society, which was in violation of law, and was afterwards abrogated, and another contract made in January, 1902, giving the president a stated salary per month, and commissions upon policies that had

theretofore been taken, as well as upon policies after-
wards to be taken; and the referee concludes that the de-
fendant had no right to give to its president a commission
on membership already secured. In this, the referee is
undoubtedly right. The salary of the president should
have been fixed by its board of directors. It is inconsistent
with the policy of the law, under which these societies are
organized and authorized to do business, to allow com-
missions to its managing officers, which are uncertain in
amount, and are to be determined by computations from
data not within the knowledge of the membership, and to
which the members have not ready access. The defendant
is therefore enjoined from transacting business until it is
made to appear to the satisfaction of the auditor, or by a
showing in this case, that no such contracts are in ex-
istence, and that no such claims of emolument are made
by the president.

5. It is charged in the petition: "By unlawful means,
liabilities against said Bankers Union of the World were
suddenly created and not shown on the books of said
Bankers Union of the World, or in the statements filed by
it in the office of the auditor of public accounts of the
state of Nebraska, and this condition of affairs was first
disclosed by an examination into the affairs of said Bank-
ers Union of the World, made and conducted by the au-
thority and under directions of the auditor of public ac-
counts; such examination of the books and affairs of the
defendant, Bankers Union of the World, disclosing the
facts herein alleged; and the further fact that the presi-
dent of the said defendant, Dr. E. C. Spinney, and the
vice-president, J. C. Spinney, who is the wife of the said
E. C. Spinney, drew from the treasury of said Bankers
Union of the World, during the year 1903, the sum of
$20,000 for their own use and benefit, and for their al-
leged services as president and vice-president of said Bank-
ers Union of the World, in fraud of the rights of the mem-
bers and certificate holders of said Bankers Union of the
World, and while said association was then, and is now,

indebted to beneficiaries for death losses in the aggregate sum of $30,000, for the payment of which said association had on hand, at the time of the examination referred to, available assets in the sum of $2,437.65." Upon this allegation, the referee finds: "From the organization of the Bankers Union of the World, its president advanced various sums to it and for its use. There is in evidence no tabulated statement of the amounts drawn out by him. There is in evidence sufficient data to show that the amounts paid to him as salary, not including commissions, is $5,015.76. The Bankers Union began business November 14, 1898. The period above contemplated is, therefore, over 5 years. The net sum he has received as salary is at the rate of less than $1,000 a year during the existence of the Bankers Union of the World"; and, second, "There was paid the vice-president, the wife of the president of the Bankers Union, for services in 1903, $50 a month for a short period. She received for the remainder of that year, for editing the official paper of the Bankers Union, $150 a month. The salary of the president of the Bankers Union, for the year 1903, was $600 a month. The salaries just referred to I find are not exorbitant." This finding of the referee does not appear to us to fully reflect the evidence upon this allegation. We do not want to be understood as expressing an opinion whether the salary as allowed to the president would, or would not, be exorbitant, when allowed by a board of directors selected as the statute requires, and freely acting in the management of the general affairs of this society. The finding of the referee, "That there is in evidence no tabulated statement of the amounts drawn out by him," is, to our minds, more serious in its nature and consequences than would appear to be regarded by the referee. There should be no uncertainty in the accounts between a salaried officer and the society, and the auditor would undoubtedly be justified in refusing a license to a society in whose transactions such uncertainty existed.

The managing officers of these societies are trustees for

the members, and must transact the business that comes within their province for the interests of the members. If it appears from their plan of organization, and their manner of doing business, that the funds of the society are considered and used by them as their personal emolument, they are not to be allowed to transact business. The defendant is enjoined from doing business until it is made to appear to the satisfaction of the auditor, or by a showing in this case, that all claims of the president against the company are fully and finally adjusted; and no claims of the president for compensation for services rendered will be made or entertained, except the regular and reasonable salary as allowed and fixed by the board of directors.

6. The petition alleges that the society is insolvent and unable to meet its pending death claims. A large proportion of the evidence relates to this allegation. The referee finds that the allegation is not proved, and we are entirely satisfied with his finding in that regard. The conduct of the officers of the society in adjusting death claims has without doubt led to great confusion, and unnecessary delay; and merits criticism. Also does its apparent reluctance and neglect to disclose to the proper authorities the true state of affairs regarding these matters, and, possibly, also the provisions of its constitution and by-laws as to the extent of its liabilities upon death claims, and its manner of determining the same. The managing officers have failed to appreciate the fact that the supervising authority of the auditor is such as to require perfect frankness and a full disclosure of its affairs, whenever demanded. We have already indicated that these evils must be corrected before business is continued. But, the allegation that the society is insolvent is wholly unsupported. The plan of its organization, if carried out, will, apparently, furnish ample funds to meet all its just liabilities, and the managing officers have been active and vigilant in the prosecution of its business. It has, apparently, during the last year, paid from the assessments collected for death claims occurring during the year, more than the

total amount of losses for the same period. The assets of such societies do not consist of tangible property and cash in hand alone. Its members pay assessments when called upon to meet the loss occasioned by the death of one of their number. If its plan of operation is feasible, its ability to meet its liabilities depends upon the good faith and solvency of its members. It can not be said that it will not be able to meet its death losses as they occur.

7. It is charged that the defendant has diverted the funds of the society and paid out large sums for the alleged purchase of the business and membership of other purchased organizations, and that the membership of such other purchased organizations were admitted to the defendant association, without medical examination, at lower and less rates of charges and assessments than required from persons originally becoming members of the defendant society. Upon this allegation the referee finds: "While all the transfers of societies above noted, except the Red Cross of Waverly, Iowa, the Home Guardians of Sterling, Illinois, and the Pioneer Life Association of Luverne, Minnesota, were made under sanction of the insurance department of this state, the evils which inhere in such transfers without authority of law have fully justified the auditor's refusal to sanction such transfers. Of these evils, the following are the most conspicuous: There is a temptation to the officers of the absorbed lodges, who receive its fund for disbursement, to use such funds for their own individual advantage. There are of necessity members whose health has failed, or who have passed the age of 55, between the date of entry into the transferred order and its transfer to another order. These must either be ignored and their insurance thus destroyed without their consent, or a physical examination must be waived, contrary to the provisions of the statute of the state. Reserves accumulated must be diverted by the transferred society to an improper purpose, and thus there must be violated a sacred trust." It appears that the insurance department of the state at one

time approved of such methods, and recognized such action as legal. It also appears that, after a change had taken place in the personnel of the department, such action was not sanctioned but disapproved, and that the defendant society, nothwithstanding such disapproval, has persisted in the same course of conduct. The statute prescribes the qualifications of members that may be admitted; and to admit members above the age limit, or without medical examination, is clearly in violation of its provisions. What may not be done directly in that regard, can not be done by taking over the entire membership of another society, and the conduct of the defendant was a manifest violation of law. It seems to be the opinion of the referee that this practice had been discontinued before these proceedings were begun, and that no further action on the part of the court is necessary than to express its disapproval thereof. We are inclined to adopt this suggestion.

8. The defendant asks that the court will, in this action, enter an order upon the auditor to reinstate the defendant, but, as before pointed out, the court is not given authority to do so under section 16 of the act. It will be the duty of the auditor to reinstate the defendant when it has complied with the order of this court, and has corrected the errors herein indicated.

The suggestion that the auditor might, through prejudice or partiality, neglect to perform this duty is wholly unwarranted by the evidence. The evidence shows a desire and effort on the part of the auditor to perform the duties enjoined upon him by statute, and his action in commencing these proceedings was not only justified, but required. by the facts as disclosed in the evidence. If this judgment is complied with by defendant within 60 days, the injunction will be dissolved. In the meantime, the injunction is continued, and if further action herein becomes necessary to protect or enforce the rights of the parties, upon application of either party, such action can be taken.

JUDGMENT ACCORDINGLY.

HOLCOMB, C. J., dissenting.

I am unable to concur in all the conclusions announced in the majority opinion. I think the defendant society should be reinstated and permitted to continue its business as recommended by the referee, but enjoined from doing certain things which are violative of the law regulating the business of such societies. It seems to me that the construction placed on the section of the statute under consideration operates unnecessarily harshly on mutual fraternal beneficial organizations, and overlooks the interests of the individual members which the statute was designed to protect. The judgment to be entered enjoining the defendant society from doing business until, at a regular or specially called meeting of its membership in delegate convention, there shall be effected a reorganization of the society, and of the plan of conducting its business, so as to conform to the requirements laid down in the opinion, has the tendency, if not the result, of extinguishing life by the slow process of strangulation. The life of an organization like the defendant society depends upon the activity and energy exerted continuously and at all times by those charged with the duty of administering its affairs. The prolonged litigation in the case at bar can not but have a most depressing effect on the strength and vitality of the organization, and now to suspend its business by an injunction, until a reorganization can be effected, as it appears to me, can but result in seriously impairing, if not altogether destroying, the usefulness and beneficent purposes which, by the judgment, it is intended to preserve. The object and aim of the statute is to regulate the management of the affairs of the society and protect its membership, and not, by injunction, to drive it out of business, except in extreme cases.

Nor do I understand that it is the province of the court to prescribe a designated plan of organization, or reorganization, as a condition of reengaging in business. The

internal affairs of the society and the plan upon which it will conduct its business are matters of concern only for its membership. It can not do business in violation of law. The court can say "thou shalt not," but, however wise and advisable it may seem to the court, it can not very well say: Unless you do business according to certain prescribed methods, which are regarded as best calculated to subserve the interests of the membership, you can not do business at all. I do not understand that a board of directors is indispensable in the management of the affairs of such an organization. The members may, without violating the law, provide for the government of the affairs and the conduct of the business of the society through other agencies and instrumentalities. All the statutes enjoin is a representative form of government.

The majority opinion enjoins the defendant society from doing business until certain errors therein mentioned and found to exist are corrected to the satisfaction of the state auditor. The history of the present case does not, as it seems to me, make appropriate an order of this kind. The auditor is thereby clothed with greater authority than is contemplated by the enactment prescribing his powers and duties. The auditor is a real party in interest in this litigation. The suit was begun at his written request. He prosecutes in the name of the state. The litigation should be as binding on him as on the defendants. The judgment and decrees entered should operate against him as forcibly as against the other parties to the suit. The controversy having been submitted to the court for adjudication, its decrees should definitely fix and determine the responsibilities and duties imposed upon and due to each of the adversaries.

The society is enjoined from doing business until its president shall release all claims for compensation for his services under contracts made with the other executive officers of the organization. Of course, the legality of his demands against the society can not be litigated in this action. He may have just demands against the society.

He may choose to assert the legality of his claim, decline to renounce it, and thus the life of the society is made to depend upon his philanthropy or his avarice, and this, as it seems to me, is not a correct adjudication of the society's right to continue its business.

As expressive of my own views of the matters in litigation, I make the following opinion, prepared by me before this case was reargued, with a view to its adoption as the opinion of the court, a part of my dissenting opinion herein:

The legislature, in 1897, passed a law entitled "An act defining fraternal beneficiary societies, orders or associations, and regulating the same" and to repeal a prior law relating to the same subject. Laws, 1897, chapter 47 (Compiled Statutes, chapter 43, sections 91-112, Annotated Statutes, 6483-6504). Section 106 provides that, upon failure or refusal of any such association to make the report provided for by the act, the association shall be excluded from doing business in the state. It is also provided in the same section, in substance, that in case of the failure to make such report, or when any such society shall exceed its powers, or shall conduct its business fraudulently, or shall fail to comply with any of the provisions of the act, an action may be begun by the attorney general at the instance of the state auditor to enjoin the society from carrying on business; that, when so enjoined, such society shall have no authority to continue in business until such report shall be made, or overt act or violation complained of shall have been corrected, provided it is found by the court that the default charged exists, whereupon the auditor shall reinstate such association, and not until then shall such association be allowed to do business in this state. Acting under the provisions of the above mentioned section and in pursuance of the authority therein given, the attorney general prosecutes the present action in the name of the state, praying in the petition that the defendant society, its officers and agents may be enjoined from further pro-

ceeding with the business of the association; that a receiver may be appointed to take charge of its affairs, and that the same may be wound up according to law. The petition alleges, and it is admitted, that the defendant is a fraternal beneficial society organized under the laws of this state. As grounds for the relief sought, the substance of the allegations of the petition is to the effect: First, that the society has exceeded the powers granted it by its license issued by the state auditor, and that it has conducted its business fraudulently, and has not fully complied with the requirements of the laws of the state; second, that the society is insolvent; third, that it has diverted the funds of the association from the purposes for which contributed, and has paid out the same for the business and membership of other similar organizations; such membership being admitted to the defendant society without medical examination, and beyond the age limit prescribed by statute, and at less rates than charged to the membership of the society generally; fourth, that the law has been violated by withdrawing, without consideration, securities donated and belonging to the society, for the purposes of putting it upon a financial basis so as to continue business; fifth, that false and fraudulent statements of its financial condition for the purpose of deceiving the auditor have been made, and thereby the insurance department was induced to renew its authority to do business in the state; sixth, that the law is violated in that the society has no representative form of government in the management of its business, and that the affairs of the society are not managed by a board of directors but by employees in the interest of its president, who, by this means, controls its affairs; seventh, and lastly, that the society's liabilities have by unlawful means been suddenly and greatly increased and large amounts drawn from its treasury by its president and vice-president in fraud of the rights of its membership. The answer of the society and its officers amounts to a general denial of these several charges of irregularities and noncompliance

with the law. A reference was directed by the court, and the referee, after having taken all the evidence offered by the respective parties bearing on the issues raised by the pleadings, has filed an exhaustive report containing his findings of fact and conclusions of law. On the referee's report, the defendant society asks for judgment in its favor. The state has filed exceptions to certain of the findings of fact, and because other findings were not made, and also to some of the conclusions of law arrived at by the referee. The findings are too voluminous to be incorporated in this opinion, and we must content ourselves by referring only to some of the more important portions thereof with an expression of our own views regarding the particular question under consideration.

While the referee's findings are in the main on all salient points in favor of the society, yet there are several matters in respect of which it is found that the society has failed, in the conduct and management of its business, to comply with certain provisions of the law. Regarding these adverse findings, however, they are not deemed by him sufficient to justify a judgment precluding the society from continuing its business in this state. As a conclusion of law it is held that the several irregularities and illegal practices found to exist can be remedied by enjoining the society and its officers from further permitting or engaging in the same. In this connection it is proper to state here that, in our judgment, it is the policy of the law under which the state is proceeding in this case to regulate the business of fraternal beneficial societies and compel compliance with the law, by enjoining that which may be found to be irregular and illegal, rather than to close up the affairs of a society and drive it out of business. A perpetual injunction or the appointment of a receiver would effectually close up the business of a fraternal beneficial society and terminate its earthly career, and it is not believed that, because it is found there has been a failure in some respects to comply with the law or to conduct the business of the society in all respects in

the manner contemplated and provided by its articles of incorporation, such results should follow unless it is made manifest that, by reason of such irregularities, the society has rendered itself incapable of accomplishing the objects and purposes of its organization. It is, we think, made clear, by a reading of the entire act and especially the section under the provisions of which these proceedings are instituted, that what the legislature intended was that compliance with the law should be required and secured, and the interest and rights of the members and certificate holders protected and subserved. If, says the statute, it is found that there has been a default, that is, a failure to comply with some of the provisions of the statute, such society shall be enjoined until the overt act or violation complained of shall have been corrected, whereupon it shall be reinstated and be allowed to continue its business. We do not mean to be understood as saying that there may not be such violations of, and failure to comply with the law as to be incapable of correction and that, in such case, the society should at least be perpetually enjoined from doing business in the state and, in a proper case, its affairs wound up through the instrumentality of a receivership proceeding. What is said is that, where the errors and irregularities can be corrected and the membership protected, it is the policy of the law to permit the society to continue its business and thus carry out the aims and purposes of its organization. The courts, in such proceedings, will look to the interests of the society at large and to those who comprise its membership, rather than to the legal rights and liabilities of those responsible for the management of the society as they might be fixed and determined when no other rights and interests intervene. The referee has evidently accepted this construction as the proper view of the law and in this our judgment coincides with his.

With reference to the first ground of complaint relating to the alleged wrongdoing by the defendant society in exceeding its authority, conducting a fraudulent business

and in not complying with the law, it may be said that
the allegations are of such general character as to be in
effect only conclusions of the pleader and, regarding
which, a cause of action is not stated. However, the dif-
ferent grounds of complaint are specifically enumerated
in subsequent paragraphs of the petition, so that no fur-
ther notice need be taken of the first ground mentioned.

It is next alleged that the society is insolvent and un-
able to meet its pending death claims. Around this point
nearly all of the evidence centered, and a mass of figures
are presented for consideration sufficient to daunt the
strongest heart and clearest head. While the question of
liabilities for death losses ought, it would seem, to be a
simple one and easily ascertainable, as also the amount of
the income from assessments from which these liabilities
are to be met, yet the society's method of doing its busi-
ness, and the provisions of its constitution and by-laws
as to the extent of its liabilties by reason of death claims,
and its apparent reluctance to disclose to the insurance
department of the state auditor's office the true state of
affairs regarding these matters, has led to unnecessary
controversy. The managing officers of the society have, it
is manifest, not complied with the reasonable require-
ments of the insurance department of the auditor's office,
and have seemingly failed to appreciate the fact that the
supervising authority of the auditor is such as to require
perfect frankness and the fullest disclosures of its affairs
whenever requested. The chief cause for the difference
between the insurance department and the officers of the
society has been with reference to the variable amounts for
which the society is liable by reason of death claims aris-
ing under the provisions found in its constitution, which
differ from the amounts called for by the face of the bene-
ficial certificate, unless the insured member has lived the
entire period of his life expectancy from the time of his
having become a member. It is found by the referee that,
by the constitution under which the society is now operat-
ing, "from each death benefit payable on account of death

before living out expectancy under American experience tables of mortality, a deduction is made of a sum equal to the amount of one annual premium for each year of the assured's life expectancy, with interest from the date of the policy to the date of death at two and one-half per cent. per annum, less the amounts paid each year into the mortuary fund by said member, together with accumulated interest on the same for the period of his membership at two and one-half per cent. per annum." It is readily seen that, in order to ascertain the amount due to the beneficiary of the certificate holder at the time of death, reference must be had to the state of his account with the society which will show his expectancy at the time of becoming a member, the annual dues or assessments paid, and those which would have become due, had he lived out his expectancy, and from this computation the amount actually due on the benefit certificate is ascertained. More or less litigation has grown out of the constitutional provision referred to regarding the legal effect thereof on certificates issued prior to its incorporation by amendment as a part of the constitution. We have assumed and, for the purposes of this case, shall assume that the society's liability for death losses is to be determined upon a basis of deductions from the face of the certificates according to the terms of such provision, without at all undertaking to prejudge or determine rights of beneficiaries in an action in which they are not parties. It would seem that, ordinarily, such provisions, when legally adopted by amendment as a part of the fundamental law of the society, become binding on all its members, and will govern in all cases in determining the society's liability for death claims accruing thereafter. *Hall v. Western Travelers Accident Ass'n,* 69 Neb. 601. The referee also finds that "The claims for losses reported and received, in 1903, amounted to $27,300. The amounts collected for deaths and disabilities, in 1903, were $56,-117.81. There was therefore collected, in 1903, the sum of $28,817.71, for deaths and disabilities in that year, in

excess of what was necessary to pay losses of that character accruing within the same period. From these figures it does not appear that the Bankers Union of the World is in a condition in which it is unable to raise funds with which to meet its liabilities by the assessment of its members. As its revenues as a fraternal beneficial association are, in the nature of its business, to be obtained only from this source, I find that the allegation that this association is insolvent and unable to meet its pending death claims, is not sustained by the evidence." Our own examination of the evidence confirms the correctness of the finding, and from it the result necessarily follows that the charge of insolvency is not supported by the evidence. An examination of the liabilities of the society at the beginning of its business for the year 1903, as shown by its annual report introduced in evidence, and at the close of its business for that year, as shown by the evidence in the case at bar, discloses marked improvement, and the inference is fairly warrantable that, during its last year of business, it has paid considerable more from the assessments collected for death claims occurring during the year than the total amount of losses for the same period, and that with proper management it should be able from its assessments to meet all legitimate demands which have accrued or, in the ordinary course of events, will accrue by reason of death from among its membership. Its revenues are derived from its assessments made upon its members and, with the rate of death loss normally to be expected, it seems to us its receipts are sufficient to meet its liabilities by reason thereof as they mature. It has paid something over $6,000 during the first half of January of the current year and just before these proceedings were begun. It is true, it has been unfortunate in the number of claims presented and resisted which have been followed by litigation. The explanation of this state of affairs has been adverted to. It does not appear that the society has been unable to meet judgment liabilities when finally adjudicated. It is also obvious that, among the

44

claims made against the society by reason of death of its members, the aggregate amount of all of which is relied upon by the state to prove insolvency, many are found which are stale and unjust demands, and for the satisfaction of which, the society is not legally liable. It is impossible in this proceeding to distinguish with any degree of accuracy the just claims from the spurious demands. It would therefore be unjust and unfair to the society to say that all of the claims for death losses, which the evidence discloses in this case have been made on the society, are legal liabilities. Upon a consideration of the whole of the evidence relating to the question, we are constrained to say that the society's liabilities for death claims are much less in amount than as contended for by the state. The line of demarcation between solvency and insolvency, when applied to the affairs of a beneficial society such as the defendant in the case at bar, is a difficult question to determine. The assets of the society do not consist of cash in its treasury and property subject to its disposal. It may not have a dollar's worth of property or a cent in its treasury, and liabilities to meet, and yet be solvent. Its assets are in the pockets of its members, to be paid into the treasury by assessments, whenever required to pay liabilities and in accordance with the terms of the contracts under which the assessments are levied and collected. If its plan of operation be such as to warrant the conclusion that it will be able to meet liabilities for deaths as they may reasonably and, under normal conditions, be expected to occur, and to pay the expenses of the management of the business judiciously conducted, then the society may, it seems to us, be said to be solvent. In such case, it would seem that the society has the ability to pay debts as they fall due in the usual and ordinary course of the business in which it is engaged, in which event it would not, in our opinion, be subject to the charge of insolvency. It is observed by the common pleas court of Ohio on the question of the solvency or insolvency of a fraternal beneficial society: •

"An ordinary business corporation is insolvent when it is unable to make payments as usual, or as they mature, or according to the undertaking, or in the ordinary course of business. *Stone v. Dodge,* 96 Mich. 514, 56 N. W. 75. A refusal to make payments does not necessarily mean an inability to pay. The fact that the liabilities of the defendant, at any given time, may exceed the funds then on hand which can be properly used to pay them, does not prove insolvency. The defendant is not required by law to keep enough money in the treasury to meet all the liabilities which may come upon it. It is not required by any by-law to collect the funds till after the liability is incurred. * * * The insolvency of such an association is, therefore, *sui generis.* It is not like that of an ordinary business corporation. It means a condition in which the association is unable to raise the funds, with which to meet the liabilities, by assessment of the members. It is assumed that some of the money to make that fund is either in the treasuries of the subordinate rulings, or in the pockets of the members. Hence, to prove insolvency, it must be proved that the money is neither in the treasuries of the subordinate rulings, nor in the pockets of the members, or, if there, that they refuse to pay it." *Baker v. Fraternal Mystic Circle,* 1 Ohio Dec. 579.

It would serve no useful purpose for us to burden this opinion with a mass of figures elucidating the conclusion we reach regarding the alleged insolvency of the defendant society. It is sufficient to say that, in our judgment, with proper management, and with the costs of conducting the business reduced to a minimum, and the maintenance of the rates as charged in the schedules of assessments, and with liabilities as fixed and determined by the present contracts of insurance, no reasonable ground exists for saying the society can not meet its liabilities in the ordinary and natural course of affairs as they mature, and that therefore insolvency is not proved. We must not be understood as expressing approval or disapproval of the plan adopted by the society in perfecting its organization and carrying

forward the purposes of its creation; nor do we hold that the management of its internal affairs is a subject of judicial control and regulation. We desire only to be understood as saying that, by the application of any accepted test for the determination of the question of the insolvency of a society doing business as a fraternal beneficial organization, it can not be said that the defendant society is insolvent and, for that reason, should be enjoined from further engaging in business, its affairs placed in the hands of a receiver and wound up.

As to the third ground of complaint mentioned in the petition, the evidence discloses, and the referee finds, that the officers of the defendant society, for the purpose of gaining accessions to its membership, have pursued a systematic course eventuating in the consolidation with the defendant society of numerous others organized for like purposes, and that, as a result of this plan of operation and in bringing about such consolidations, the laws governing and regulating the business of fraternal beneficial societies have been disregarded in more than one particular. By the methods adopted and practiced in consolidating different societies, the law requiring admission to membership into a fraternal society upon medical examination, by a competent physician, and also the provision of the statute fixing a limit as to the age of a person who may be admitted as a member, have been violated. It is also disclosed by the evidence, and found by the referee, that, in some instances, where such consolidation has been effectuated, trust funds of the absorbed society have been diverted from the use for which contributed, and used for the purposes of effectuating a consolidation of the absorbed society with the defendant. The referee upon this point finds: "While all the transfers of societies above noted, except the Red Cross of Waverly, Iowa; the Home Guardians of Sterling, Illinois, and the Pioneer Life Association of Luverne, Minnesota, were made under sanction of the insurance department of this state, the evils which inhere in such transfers without authority of law,

have fully justified the auditor's refusal to sanction such transfers. Of these evils, the following are the most conspicuous: There is a temptation to the officers of the absorbed lodges, who receive its funds for disbursement, to use such funds for their own individual advantage. There are, of necessity, members whose health has failed, or who have passed the age of 55, between the date of entry into the transferred order and its transfer to another order. These must either be ignored and their insurance thus destroyed without their consent, or a physical examination must be waived, contrary to the provisions of the statute of the state. Reserves accumulated must be diverted by the transferred society to an improper purpose and thus there must be violated a sacred trust." It is to be said, in this connection, that the insurance department at one time approved of such methods and gave official recognition to the legality of such action. It is also manifest that, as at present organized, the department refused to sanction such action, and that the defendant society, notwithstanding such disapproval, has persisted in conducting its business along these prohibited lines. In the absence of a statute making provisions for and authorizing the joinder or consolidation of different fraternal societies when desired by their membership, so that the two organizations may coalesce, it is evident under our present statute that such results, even though wise and beneficial, can be accomplished only by admitting to membership in the surviving society those alone who have complied with the express requirements of the statute with reference to medical examination, and the age limit, as therein found. It ought not to require discussion or argument as to the inviolability of trust funds held by a beneficial society and the duty of the courts to require their application to the uses and purposes for which contributed. We find no difficulty, however, in respect of the matters last discussed, in bringing our minds to the conclusion that these irregularities and illegal practices may be corrected, and that, by restraining the defendant from a further continuance

thereof, the purposes of the statute will be fully subserved and the rights of the individual membership of the society best protected.

As to the fourth ground of complaint, the referee finds, and the evidence fully supports the finding, that the president of the society, in withdrawing the securities complained of, at the same time paid into the society treasury the fair market value of such securities and that, in this regard, the complaint of the state is ill-founded.

Exception is taken by the state because, as contended, no finding was made by the referee as to the fifth ground of complaint. We are disposed to the view that the several findings of the referee fairly cover and include the issue presented by the paragraph of the petition referred to. In the sixth paragraph of the findings it is found that the reports of the financial condition of the society filed with the state auditor were not full, complete and accurate statements, such as are required by law. In regard to this complaint of the state, it is to be observed that a difference of opinion exists, having a reasonable foundation for its basis, as to the exact nature and scope of the information the financial reports to the state auditor should contain. The reports made to the auditor were not false and fraudulent in the sense that they were intended to deceive the insurance department, and thereby obtain a license and permission to continue a business which was being conducted in fraud of the rights of the members of the society. It is a fraud of this character, as we understand the statute, that is referred to in the section on which this action is grounded. The mere fact that the reports of the society to the auditor did not contain all the information they properly should, does not justify the inference that the society is conducting a fraudulent business, within the meaning of that section. The officers of the society have failed to include in their reports to the insurance department death claims, where the proofs had not been completed to their satisfaction or where, for any reason by them deemed sufficient, the claims were regarded as un-

just, and for the satisfaction of which no legal liability was deemed to exist against the society. It is not to be doubted that all reasonable requirements of the insurance department in regard to disclosures of liabilities, either contingent or fixed, actual or apparent, are to be complied with by every insurance society coming within its jurisdiction. But these requirements, whatever they may be, are of a uniform character, and a general rule in that regard bears upon each society doing a like business in the same way. The statute under consideration specifically requires that, in the annual report to the auditor, information shall be disclosed as to the number of losses or benefit liabilities incurred, and the number and kind of claims compromised or resisted, with a brief statement of the reasons therefor. (Compiled Statutes, ch. 43, sec. 100, Annotated Statutes, 6492.) It is clearly the duty of the proper officers of the defendant society to furnish, in their reports to the insurance department, the information above specified and this includes, of course, every claim for death benefits for which proofs have been furnished in accordance with the rules and requirements of the society, even though it is believed, or as a matter of fact, there do exist good and sufficient reasons for regarding the claim as unfounded, and for the satisfaction of which no liability exists against the society. The conclusion of the referee regarding this phase of the controversy is: "If permitted to do business the Bankers Union, as well as its officers who are defendants in this case and their successors, should be enjoined from withholding information from their reports, and from the auditor of public accounts of this state, of information of the nature indicated, and any other information, or means of deriving information, as to the business and business methods of such Bankers Union of the World, which said auditor may deem necessary." This conclusion is believed to be a correct construction of the law and is therefore confirmed.

As to the sixth ground of complaint, the referee finds as follows: "It is provided by section A, division 3 of the

constitution of the Bankers Union of the World, that the supreme officers of the supreme lodge shall be 9 in number. These, by section C, division 1 of said constitution, are required to be elected by supreme lodge delegates. It is further provided in said section A, as follows: 'There may also be not more than 8 directors elected by said supreme officers. The officials above designated shall together constitute a board of directors, and all the power and authority of the supreme lodge shall, when not in session, be vested in the board of directors, the same as though the said supreme lodge was regularly convened in open session.' It is provided in section B, division 3 of said constitution, that: 'All of said officers of the supreme lodge shall be elected for the term of 2 years, and until their successors are elected and qualified.' The effect of the above provisions is to create a possible board of directors 17 in number, of which board 8 members are to be elected by the executive officers. These 8 directors are not to be chosen by the members of the Bankers Union of the World, nor by the representatives of the said members selected for that purpse." The referee concludes: "The provisions for the appointment of 8 directors by executive officers is entirely nugatory, for the reason that this method of providing directors is in conflict with section 91, chapter 43, Compiled Statutes (Annotated Statutes, 6483), requiring that fraternal beneficial associations shall have 'a representative form of government.' If the Bankers Union is permitted to do business, there shall be an injunction against the appointment, or the recognition of any director appointed by supreme lodge officers." These findings and conclusions are confirmed, and the provisions for the selection of 8 directors by the executive officers is held to be a nullity, and of no force, because violative of the section mentioned, which declares that such societies shall have and maintain a representative form of government in the management of their affairs. While the internal affairs of the society are, except where conflicting with the law, matters of concern

only for the membership of the organization, and are not properly under the control or direction of the courts, it is quite patent to us that a large share of the difficulties which have been incurred by the defendant society arises by reason of its methods of government. It has no direc- · tory, in the proper sense of the word, to guide and direct the general management of its affairs. Its directory, as provided for, as has been noted, is clearly in violation of the statute; but even this provision for a directory has not been attempted to be put into practical operation by those purporting to have authority so to do. The management of the affairs of the society, by its membership and under its constitution and by-laws, has been left exclusively within the control of its supreme executive officers. These officers have not only had to do with the general affairs of the society, but, in a measure and in many instances, have dealt with themselves in making contracts in such a way that their personal interests and the interests of the society at large have come in direct conflict, and because thereof, the latter has been the greater sufferer. In this connection it is proper to note that, by the finding of the referee, it is made to appear that, soon after the organization of the society, a sweeping contract was made by those purporting to act in its behalf with its president, the nature of which need not here be discussed, which, because of its objectionable features, was later on abrogated, and in January, 1902, an arrangement was made whereby the president was to receive a stated salary a month, "and commissions at the rate of 5 cents a $1,000 for single life policies, and 7 and a half cents on joint policies, on all the policies shown by certain books of the Bankers Union designated as A, B and C." The receipt of these commissions ended in June, 1903, after something like $4,000 had been received under the contract. As a conclusion of law, the referee holds that because of the provisions of section 103, chapter 43, Compiled Statutes (Annotated Statutes, 6495), the Bankers Union of the World had no right to give to its president a commission on its membership al-

ready secured, and, consequently, if the society is permitted to do business, it should be enjoined from paying, and its president should be enjoined from receiving pay or credit for, commissions to any amount of that character. The conclusion reached by the referee is a correct interpretation of the law and is approved. With reference to the last ground of complaint, the referee finds upon the fullest investigation, and we are disposed to adopt his finding, that the charge made is not sustained by the evidence. The referee finds: First, "From the organization of the Bankers Union of the World, its president advanced various sums to it and for its use. There is in evidence no tabulated statement of the amounts drawn out by him. There is in evidence sufficient data to show that the amounts paid to him as salary, not including commissions, are $5,015.76. The Bankers Union began business November 14, 1898. The period above contemplated is therefore over 5 years. The net sum he has received as salary is at the rate of less than $1,000 per annum during the existence of the Bankers Union of the World." And, second, "There was paid the vice-president, the wife of the president of the Bankers Union, for services in 1903, $50 a month for a short period. She received for the remainder of the year, for editing the official paper of the Bankers Union, $150 a month. The salary of the president of the Bankers Union, for the year 1903, was $600 a month. The salaries just referred to I find are not exorbitant."

A consideration of the entire record leads to the conclusion that the defendant society should be reinstated and permitted to continue its business; that such an order will best subserve the interests of its certificate holders, whose rights, we are disposed to view, were the principal object of legislative solicitude in the enactment of the section of the law we have under consideration. In the further prosecution of the business affairs of the society, its executive officers who are made defendants in this action should be restrained from doing those things herein found to be irregular or not in compliance with the requirements

of the law, and from withholding from the state auditor any and all information pertaining to its affairs, showing its financial condition or relating to claims for death losses and disability benefits, whether the liability has been adjusted or in process of adjustment, or whether the claim has been compromised or is resisted, and all other needful and necessary information required by the rules of the insurance department, in the exercise of its supervisory authority over the affairs of insurance societies organized under the law under which defendant is operating.

The costs of the action should be taxed against the defendant society, as by section 106, chapter 43, Compiled Statutes (Annotated Statutes, 6498), is provided shall be done.